IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ELM CABIN JOHN, LLC, *et al.* | * | |
| | * | |
| Plaintiffs/Counter-Defendants | * | |
| | * | |
| v. | * | Civil Action No. PJM 16-3862 |
| | * | |
| UNITED BANK | * | |
| | * | |
| Defendant/Counter-Plaintiff | * | |

## MEMORANDUM OPINION

Nancy Long (Long)[1] sues United Bank (the Bank)[2] for negligence for wrongfully taking a deed of trust and subsequently threatening foreclosure on three parcels of property she claims belonged to her, which resulted from unauthorized and/or fraudulent actions taken by Long's former Limited Liability Company (LLC) joint venturer Andrew Economakis in connection with a project to develop the properties.

Long says in consequence that she is entitled to the proceeds of the sale of the two properties that the Bank effectively forced her to sell to satisfy a loan to Economakis and his associates. Specifically, she alleges that the Bank negligently failed to verify the authority of Economakis to act with respect to the properties when, without her participation or authorization,

---

[1] Elm Cabin John, LLC is a Co-Plaintiff in the case, but its presence is essentially for technical purposes. In the past and more recently, the LLC has purported to hold title to the properties Long claims ownership of. Some time after the events that comprise this lawsuit took place, Long assumed sole ownership of Elm Cabin John, LLC, an entity that she was not a part of as of the time that the facts underlying Long's claim took place. Long, on her own, eventually sold the third of three properties involved in the suit in the name of Elm Cabin John LLC. ECF No. 51-8 at 151.
[2] United Bank is the successor in interest to Georgetown Bank, the Bank of whose actions Long complains. For the sake of simplicity, the Court will refer to "United Bank" throughout as "the Bank."

1

he offered them to the Bank as collateral for a construction loan on the properties, an action directly inconsistent with the terms of the agreement Long says she had with Economakis (and a third joint venturer Thomas Manion). The Bank, which made a $1.6 million construction loan for development of the properties and thereafter took the deed of trust to the properties as collateral for the loan, asserts that Long was fully aware of and authorized Economakis to offer the properties as collateral and, in any event, that she eventually ratified his acts after the fact. The Bank also argues (a) that the statute of limitations ran on Long's claims before she filed this suit; (b) that she was contributorily negligent; (c) and that she has not shown she sustained any injury or damages proximately caused by the Bank's actions. The Bank has countersued Long for tortiously interfering with Elm Cabin John LLC's purported agreement with the Bank not to sue it, as well as the Corporate Co-Plaintiff in the case, Elm Cabin John LLC, for breaching that same agreement.

The matter is before the Court on the Bank's Motion for Summary Judgment and Plaintiffs' Motion for Summary Judgment on Counterclaims. The Court **DENIES** both Motions.

I.

The facts of the case at this stage are quite convoluted, but as best they can be unpacked, appear to be as follows:

Long inherited some ten properties in the town of Glen Echo in Montgomery County, Maryland, which she eventually consolidated into three properties for the purpose of developing them. Long's ancestral home, where she resided, was on the third property. Her idea was to sell the first two properties and use the proceeds from the sales to renovate the third property. She was already in her 80's in 2011 when she pursued this project and was unsophisticated in matters

pertaining to real estate development. ECF No. 58 at 29. Accordingly, early on Long engaged an architect, Thomas Manion (Manion), who introduced her to a real estate developer, Andrew Economakis (Economakis), to help develop the three properties. Long avers that from the outset the understanding of the threesome was that Long would contribute the properties, Manion the architectural services, and Economakis the funds necessary for developing the properties.

In 2010 an Operating Agreement was drafted, presumably by Economakis (or more likely his attorney Joseph McBride), implementing the parties' oral understanding. *See* Operating Agreement for an "ELM, LLC," ECF No. 51-8 at 37 (specifically noting that the Operating Agreement was to be among and between <u>E</u>conomakis, <u>L</u>ong, and <u>M</u>anion (the first letters of their last names spelling out "Elm")). In that document, Long and Economakis were listed as managing members. *Id*.

The development plan got underway when Long, as individual owner of the three properties, conveyed them to an entity (set up by Attorney McBride) known as Nancy Long LLC, of which she was the sole member. *See* ECF No. 51-8 at 29 (Articles of Organization for Nancy Long, LLC, dated May 8, 2009 and signed by McBride); *id.* at 45 (June 9, 2010, deed by Long individually transferring the properties to Nancy Long LLC). The ostensible reason for proceeding this way was to exempt the transaction from certain transfer taxes. McBride registered Nancy Long LLC as a limited liability company with the State of Maryland. ECF 51-8 at 29.[3]

---

[3] As will be discussed *infra*, the deed transferring the properties from Nancy Long individually to Nancy Long, LLC was not actually recorded until May 12, 2011—eleven months after it was executed, in the middle of closing the development loan on the properties. ECF No. 51-8 at 49. It was specifically noted on the recorded deed to Nancy Long LLC that the transfer was "between individual and her solely owned LLC," *id.*, a statement of ownership the Bank cannot have failed to notice.

3

In his search for funds to develop the properties, in early 2011 Economakis came into contact with United's predecessor in interest, Georgetown Bank. *See* ECF No. 56-4 (Bank's proposal letter dated February 24, 2011). From the start, Economakis and he alone, with no involvement of Long (nor apparently of Manion), conducted negotiations with the Bank relative to the funding he sought.

In connection with his efforts to obtain the loan, Economakis took some unusual steps. According to Long, without her knowledge or authorization, on or about March 3, 2011 he filed a single-page form with the Maryland State Department of Assessments and Taxation, changing the name of Nancy Long LLC, which supposedly held record title to the three properties, to a newly formed entity, Elm Cabin John, LLC. ECF No. 58-15 at 2. Economakis signed the change of name form as "Managing Member" of Nancy Long LLC (which arguably he was not). *Id.* The renamed entity, Elm Cabin John LLC, purported to have as its members Economakis and certain members of his family or associates but did not include Long or Manion. To be clear: Economakis did not seek to accomplish the transfer of the properties to Elm Cabin John LLC by arranging for their <u>purchase</u> from Nancy Long LLC (although the Bank, in its Credit Request and Approval Summary, ECF No. 56-3 at 3, wrongly noted that Elm Cabin John LLC had <u>purchased</u> the properties). The purported transfer was effectuated by the single page corporate change-of-name form Economakis filed with the State Department of Assessments and Taxation. ECF No. 58-15. According to Long, all this was done without her knowledge or authorization. ECF No. 76 at 5-6. Indeed, the newly renamed LLC to which the Bank eventually made a loan may never have had a

valid written Operating Agreement.[4] It was this Elm Cabin John LLC, supposedly "owned" in equal parts by Economakis, his family and friends (but not by Long), that Economakis took to the Bank as the ostensible owner of the properties he intended to post as collateral for the construction loan. ECF No. 56-3 at 3.

On or about April 27, 2011, the Bank issued a commitment letter for a line of credit to Elm Cabin John LLC in the amount of $1.6 million dollars, ECF No. 56-2, on which Economakis immediately began to draw. Three weeks later, on May 20, 2011, as security for the loan, Economakis, on behalf of Elm Cabin John LLC, executed a promissory note and deed of trust to the properties it claimed to own in favor of the Bank. Economakis and members of his family and associates were listed as "guarantors." *Id.*; ECF No. 56-5 at 1, 47. Long was in no way involved in the closing. The deed of trust from Elm Cabin John LLC to the Bank was recorded in the Montgomery County Land Records on May 25, 2011. *Id*.

The Bank's underwriting was hardly ideal. Indeed, when it issued its Loan Commitment Letter on April 27, 2011, the deed of the properties from Nancy Long individually to Nancy Long, LLC had not yet been recorded. The Bank clearly had not in fact verified who was record owner, because the Land Records of Montgomery County would have shown that Nancy Long individually

---

[4] In the course of these proceedings, the Bank has submitted a document purporting to be an "Operating Agreement" for Nancy Long, LLC, dated January 2014, effective *nunc pro tunc* May 10, 2009. ECF No. 51-8 at 133-39. The "Operating Agreement" names Economakis as the Managing Member of Nancy Long, LLC, which is how he characterized himself on the corporate-change-of-name-form filed on March 3, 2011, but <u>suspiciously</u> the Agreement purports to be effective prior to the date of Long's individual transfer of the properties to "her solely owned LLC." *Id.* at 49. The "Operating Agreement" was clearly created after the fact and may well have been fabricated by Economakis to cover the tracks he made while, inconsistent with what Long says was her understanding with him, he offered the properties as collateral for the loan he was seeking from the Bank.

still owned the properties.[5] The Bank therefore had to play catch-up and get the deed to Nancy Long LLC recorded as quickly as possible, *see* ECF No. 51-1 at 16, which occurred on May 12, 2011. ECF No. 51-8 at 49.

With the recording of the deed to Nancy Long LLC, the Bank was expressly on notice that Nancy Long LLC was "<u>solely owned</u>" by Nancy Long, because that was what the deed recited. Even so, it was the properties deeded to Nancy long LLC that Economakis and Elm Cabin John LLC were offering to the Bank as collateral. *See* ECF No. 51-8 at 49 (emphasis added). On what basis could the Bank have determined that Elm Cabin John LLC held valid title to the properties? It would seem that, at best, its determination of Elm Cabin John LLC's ownership would have been based on (a) the single change-of-name form that Economakis filed with the State, (b) Economakis' verbal representations that the proposed borrower Elm Cabin John LLC was a legitimate entity and that he—Economakis—was authorized to act for it and post the collateral,[6] and, remarkably, (c) the representations of McBride, Economakis' attorney, whom the Bank allowed to conduct the title search and whose title company wrote the title insurance on the properties. At all events, the Bank never sought out or consulted with Nancy Long personally to clarify the situation. Since Long was not in any way involved in the Bank's negotiations with Economakis, she was never able to tell the Bank what she believed the actual agreement of the original LLC joint venturers had been—most

---

[5] Indeed, as of 2011, the name "Elm Cabin John, LLC" never appears in the Land Records in respect of the properties as the <u>grantee</u> of Nancy Long LLC. It only appears as of May 25, 2011 as the grantor of the deed of trust from Elm Cabin John LLC to the Bank. Book 41641, pp. 291-337, MDLANDREC.NET. Again, the deed of trust expressly refers to "Elm Cabin John LLC… which was previously known of record as Nancy Long, LLC." *Id.*

[6] An LLC Certification executed by Economakis to the Bank recites that it shall include the borrowing LLC's – i.e., Elm Cabin John LLC's-- Operating Agreement as an attachment, but no operating agreement was in fact attached. *See* ECF 56-8. The Bank does aver, however, that Economakis provided the Bank with an operating agreement listing other individuals—not Long and not Manion-- who were willing to personally guarantee the loan as members of the LLC. ECF No. 51-1 at 6; ECF No. 78 at 11 n. 27.

6

prominently that Economakis was supposed to arrange for financing for the development of the properties on the basis of his own or his family's wealth, but not on the security of Long's properties.

By September 2013, the construction loan had gone into default, ECF No. 58-20, 58-21, and by November 2013 the Bank notified Long (after she had been unable to get any explanation from the Bank of what was happening) that the properties it had taken as collateral would be going into foreclosure. ECF No. 56-13.

At that point Economakis commenced negotiations with the Bank in search of ways to cover the default. Notably, rather than initiating proceedings to recover from Economakis, *et al.*, individually, as Long believed it was supposed to do, the Bank immediately threatened to have the collateralized properties sold in order to cover the balance of the debt. *See* ECF No. 56-13 (letter from the Bank discussing steps toward foreclosure in November 2013), *Bank of Georgetown v. Economakis*, et al., Circuit Court for Montgomery County, Case No. 388608V (case seeking confessed judgment filed March 19, 2014). However, before actual foreclosure proceedings were initiated, Economakis advised the Bank that full-blown foreclosure would not be necessary because he could arrange to have one or more of the properties Long claims sold and the proceeds applied to the loan balance.

By that point, Long's agitation was at its peak. Increasingly, she wondered why her properties, and not the personal resources of Economakis and his family and associates, were being used to satisfy the loan. She specifically tried to contact the Bank to find out what was happening on October 22, 2013, ECF No. 58-24 at 3 (which, significantly, was one day within the three years' statute of limitations for filing the suit against the Bank, which occurred on October

7

21, 2016). *See* ECF No. 1. But as late as November 13, 2013, the Bank refused to talk to her about the loan, on the grounds that she was neither a member of Elm Cabin John LLC nor was she in any way involved with the properties in question. *See* ECF 56-13 (letter from Bank to Long "respond[ing] to [her] letter of November 1, 2013" and refusing to include Long in meetings or discuss the because she was "not a borrower on this loan—either in name or as a member of the LLC").

Eventually, with foreclosure proceedings imminent and, Long suggests, bowing to considerable pressure from the Bank as well as from Economakis, *see* ECF No. 58-11 at 13, she acceded to the sale of two of the properties. The first property was sold on December 30, 2013, and the proceeds in the amount of $332,361.77 went toward a partial payoff of the loan. ECF No. 58-22. Then on June 27, 2014, the second of the three properties was sold for $1.1 million, ECF Nos. 58-11 at 13, 58-23. A substantial portion of the proceeds from the sale of the second property were applied to the remaining balance on the loan, $668,783.30. ECF No. 58-23.[7] Compl. at ¶ 21. However, for some reason, between the dates of those two sales— i.e. on March 19, 2014— the Bank filed suit in the Circuit Court for Montgomery County against the Economakis "guarantors" of the loan and uncontested confessed judgments were almost immediately entered against them. Then, instead of seeking to collect on the confessed judgments they had just obtained against the

---

[7] Part of the overage from the second sale in the amount of $68,569.73 was paid to Long. It is not clear from the record what happened to the remainder of the overage, or whether Long's portion was paid directly to her or to Elm Cabin John LLC, then split among her, Economakis, and Manion. If the entire overage was paid to Long individually as opposed to the LLC, one might question why it would have been paid to her if Elm Cabin John LLC was in fact the legitimate owner of the properties.

Economakis guarantors— which Long claims was precisely what she and her joint venturers had agreed to—Economakis and the Bank pushed forward with the sale of the second property.[8]

At or about this same time, in what may have been an effort to cover his tracks in dealing with the properties Long claims were hers and apparently attempting to maintain authority over Elm Cabin John LLC, Economakis drafted (or, more likely, had his lawyer McBride draft) a document in which he prevailed upon Long to ratify, after the fact, all the questionable actions he had taken in the transaction. ECF No. 58-11 at 6, ECF No. 51-8. Accordingly, on January 27, 2014 Long signed a statement to that effect. *Id*. Indeed, later on Economakis presented Long with a second document drawn by him (again, presumably by McBride), exonerating Economakis from any personal liability to Long based on the actions that he had taken.[9] 58-12 at 4-6, 51-8 at 141. Long is clear about this: When Economakis presented these documents to her, Long says, he was angry and she felt considerable pressure. ECF No. 58-12 at 4-9. At that point, Long was approximately 84 years of age.

Eventually Long came to the conclusion that she had been euchred out of her properties by Economakis and the Bank, such that on October 21, 2016, she filed a Complaint in the Circuit Court for Montgomery County. That is the Complaint that was removed to this Court on December 1, 2016. ECF No. 1. Here, as in Circuit Court, Long maintains that the Bank should never have taken

---

[8] If the Bank was confident that Elm Cabin John LLC owned the properties and that there was more than enough equity in the properties to satisfy the loan, why would the Bank have found it necessary to go after the guarantors? Query: Could it have been that the Bank had an inkling that it was, in fact, supposed to go after Economakis *et al.* individually and not against the properties?

[9] Long admits that, on and off over the course of the transaction, she was assisted *pro bono* by an attorney friend with no particular experience in real estate law. Given her age, in particular around 80 years old at the time of the loan negotiation and work-out, the extent to which Long could reasonably have understood what kind of deal was going down is open to question, which is to say, amounts to a triable issue.

9

her properties as collateral without her knowledge or consent. The Bank, she says, should have realized that Economakis was acting without her consent or authorization and was at least on constructive notice that Economakis had misappropriated her title to the properties and as well, it may be added, that he had financially exploited her status as an elderly person, particularly one unsophisticated in matters of real estate development and bank lending practice.[10] At the very least, says Long, had the Bank done due diligence in underwriting the loan, it would have discussed the loan with her and through that conversation, it would have learned that the properties were never intended to serve as collateral on the loan, and, more importantly, that Long would not have agreed to the arrangement Economakis and the Bank were pursuing.

Long submits that the Bank's underwriting was negligently, if not grossly negligently, deficient. She suggests, moreover, that the Bank cannot conclusively avail itself of the self-serving CYA[11] documents prepared by Economakis (or McBride) after the fact, which very probably were intended by him to cover his tracks in an effort to immunize himself from any suit by Long. At a minimum, Long submits, those documents should be inquired into by the trier of fact to determine if they were the product of undue influence by Economakis.

---

[10] Financial exploitation of the elderly has been expressly recognized by Maryland law. It means any action which involves the misuse of an elder (at least 65 years old) adult's funds, property, or person. MD CODE FAMILY LAW § 14-101. Of undoubted relevance to this case, it may be noted that in 2012, the Maryland legislature passed a law requiring employees of financial institutions to report suspected exploitation of elderly adults (whereas before it had been encouraged but not mandatory). HB 1257/ SB 941. According to the Office of the Maryland Attorney General, such exploitation can occur without the elder's consent, but can also occur when the elder is tricked into giving consent or is too confused about the situation for his or her consent to be valid. *See* Maryland Office of the Attorney General, *Maryland's Project SAFE: Model Reference Manual for Financial Institution Employees* (2d Edition, September 2012), available at http://www.oag.state.md.us/Consumer/ModelEmployeeReferenceManual.pdf.
Had the Bank done due diligence in its underwriting in this case, and had it spoken with Long to determine her role with the LLC and the properties, it may very well have found itself in the type of situation it would have been <u>required</u> to report, had all this occurred one year later.

[11] "CYA," charitably interpreted, means "Cover Your Assessment."

## II.

Under Federal Rules of Civil Procedure 56, the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 233 (1986). When the parties have filed cross-motions for summary judgment, the Court must "review each motion separately on its own merits to 'determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). Moreover, "[w]hen considering each individual motion, the court must take care to 'resolve all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that motion." *Id*.

## III.

A cause of action in negligence is stated if the plaintiff establishes that (1) the defendant owed her a duty and, (2) defendant breached the duty, (3) proximately causing (4) damages to plaintiff. *Jacques v. First Nat. Bank of Maryland*, 307 Md. 527, 531 (Md. Ct. App. 1086).

Long's theory of recovery has a few extra layers: first, that Economakis misappropriated title to her properties, implicitly engaging in elderly financial abuse when he transferred her properties to an LLC entity that included his family and associates but excluded her, then had the entity use her properties as collateral for a loan that he and his family members were supposed to pay back individually, and; second, that the Bank was derelict and complicit, which is to say negligent, in not verifying Economakis' right to use Long's properties as collateral for the construction loan. Third, says Long, the Bank compounded its negligence when Long attempted to communicate her position to the Bank, and when the Bank flatly and unreasonably, which is to say negligently, refused to hear from her, expressly excluding her from any discussions about what

11

she claimed were her properties. Accordingly, when the Bank proceeded to make the loan to Elm Cabin John LLC, the Bank breached its duty of care to Long, an elderly property owner, by wrongfully taking her properties as collateral and by effectively forcing her to sell at least two of the properties after threatening to foreclose on the properties.

As Long's expert Nancy Gusman, former President of the Maryland Land Title Association, puts it, there were "simply too many discrepancies and unresolved questions concerning ownership of the properties to justify the contemplated loan and encumbrances." ECF No. 58-4 at 4. Gusman cites thirteen "red flags" that, in her opinion, should have led the Bank, at the very least, to ask questions: (1) the unclear authorization of the name change from Nancy Long LLC to Elm Cabin John LLC; (2) the Elm Cabin John LLC Operating Agreement dated ten months before the purported name change; (3) the inconsistency within the Elm Cabin John LLC Operating Agreement in its references to Economakis as a sole "owner" whereas the Agreement is signed by four individuals; (4) inconsistencies in the Elm Cabin John LLC Operating Agreement as to whether the entity was called Elm Cabin John LLC or ELM LLC; (5) inconsistencies in the listed addresses for Elm Cabin John LLC; (6) the failure to ask-- "Who is Nancy Long and where does she fit into this transaction?"; (7) the missing exhibit in the Elm Cabin John LLC Operating Agreement listing the collateral contributed by each member; (8) "Section IV of the Operating Agreement [being] inconsistent and incomplete"; (9) the lack of clarity in Elm Cabin John LLC as to whether the Managing Member could act individually for the LLC; (10) the absence of any provision for non-managing members of Elm Cabin John LLC to transfer their interests or withdraw; (11) the troubling sequence of events that shows an Operating Agreement for Elm Cabin John purporting to be valid prior to the June 2010 deed of the properties to Nancy Long LLC, and prior to the deed

being recorded in May 2011; (12) the Bank's finding that Economakis had "purchased" the properties, without the presence of a document in the name of Elm Cabin John LLC showing payment for the purchase; and (13) the Bank conducting due diligence only after issuing the April 27, 2011 loan commitment letter. The list is not necessarily exhaustive.

It may be true that, after the fact, Economakis prevailed upon Long – an elderly citizen in her eighties – to execute documents ratifying all the actions that he had taken with the Bank, as well as to forego any personal claims she might have against him. But that said, it is by no means conclusive that the Bank may avail itself of those documents by way of defense. Since the documents prepared by Economakis (or his attorney) were and are arguably self-serving and, as Long suggests, quite likely the result of undue influence, those aspects can fairly be probed in this collateral proceeding against the Bank.

None of the reasons advanced by the Bank to summarily defeat Long's claim at this juncture is dispositive. First, it is clear that the Bank flat-out refused to discuss any aspect of the loan transaction with her as late as November 13, 2013, three weeks within the statute of limitations, when it took the position that she was in no way connected with the loan. This undisputed fact alone disposes of the Bank's statute of limitations argument.

Nor is much comment necessary with regard to the Bank's argument that Long has suffered no damages in consequence of the Bank's actions. Obviously, she suffered damages to the extent that she lost one property totally and a substantial portion of the second property when Economakis misappropriated her title and took the title to the Bank to use as collateral, without her knowledge or authorization. It would certainly be plausible to conclude that these damages were proximately occasioned by the Bank's refusal to hear from Long, despite her individual record

13

ownership of the properties, followed by the Bank's institution of foreclosure proceedings, which effectively forced Long to sell two of the properties and thereby lose the sales proceeds as to each (less approximately $70,000 on the second property). [12]

Finally, of course, the Bank's argument that Economakis was expressly authorized to enter into the loan agreement using the properties as collateral, and that the Bank had no obligation to look beyond what Economakis (or perhaps McBride) told them, is a seriously disputed proposition at the very heart of the case. If it is determined by the trier of fact that Economakis was at all times authorized by Long to act with respect to the properties, her claim will come to naught. On the other hand, should the trier of fact determine that the Bank was derelict and/or complicit, which is to say, negligent in allowing Economakis to effectively misappropriate Long's title, and/or in overlooking what may well have been the financial exploitation of an elderly person when it took the properties as collateral, then by threatening foreclosure which effectively forced their sale, Long will prevail. It is similarly a question for the trier of fact to determine whether any negligence on Long's part contributed to her own injury.[13] As for the Bank's counterclaim that Elm

---

[12] In the matter of damages, it is open to question whether the Bank itself has been truly "damaged" in this case. The record suggests that, in connection with its loan to Elm Cabin John LLC, the Bank took out title insurance to cover a potentially defective title—insurance provided by McBride, Economakis's lawyer no less. Assuming that title insurance was in fact issued, the proceeds would have been (and may still be) available to the Bank to collect on its confessed judgment against the Economakis group, which would have made it unnecessary to threaten to foreclose on and effectively force the sale of the properties Long asserts ownership of.

[13] In Maryland, contributory negligence is an affirmative defense that, if proven, precludes a plaintiff from recovering. *Coleman v. Soccer Ass'n of Columbia*, 432 Md. 679, 690 (Md. Ct. App. 2013). "As a general rule, the issue of contributory negligence is a question for the jury '[w]here there is a conflict of evidence as to material facts relied on to establish contributory negligence, or more than one inference may be reasonably drawn therefrom.'" *Baltimore Gas & Elec. Co. v. Flippo*, 348 Md. 680, 703 (Md. Ct. App. 1998) (internal citation omitted); *see also Belleson v. Klohr*, 257 Md. 642, 646 (Md. Ct. App. 1970) ("If there is any competent evidence, however slight, leading to support the plaintiff's right to recover, the case should be submitted to the jury."). At the very least, the Court finds that in this case the question of contributory negligence is for the trier of fact to decide.

Cabin John LLC has breached an agreement not to sue, the precise nature of Elm Cabin John LLC's involvement at various times in this case is also very much open to dispute.

Fundamentally, this case is about whether an elderly, essentially unsophisticated property owner was swept into a real estate transaction that she could not reasonably have been expected to understand. Unanswered questions abound. Could she have reasonably comprehended what Economakis was trying to accomplish with the corporate name change of Nancy Long LLC and the creation of Elm Cabin John LLC (as to which she was unaware she had been excluded from membership)? What was she to make of the effective transfer of her properties by Elm Cabin John LLC, to the Bank? Did the Bank unreasonably and unfairly deny Long an opportunity to explain what her agreement with Messrs. Economakis and Manion was? Where does the Operating Agreement for "ELM, LLC," which lists Manion, Economakis, and Long as members, come into play? What "Operating Agreement" did the Bank see when evaluating the loan application, if any? Should the Bank have noted the discrepancy between the so-called Operating Agreement for "Elm LLC," which included Long as a member, and "Elm Cabin John" LLC, which did not? And should the Bank have probed further in the matter? Would it not have been reasonable for the Bank to explore what the actual agreement between Long and Economakis was by talking to Long and Manion? Did the Bank rely entirely on Economakis' and his lawyer-cum-title-attorney McBride's representations as to Elm Cabin John LLC's authority to act with respect to the properties, to the exclusion of any participation by Long? Was the post-hoc Ratification Agreement drawn by Economakis (or his attorney) a result of undue influence? Was Long's "settlement" agreement with Economakis the product of undue influence? To what extent should those documents be available for the Bank to rely upon in its defense of this suit?

These and related questions are all seriously disputed and, as such, must be decided by the trier of fact. However, to the extent that ancillary equitable relief may also be appropriate, the resolution of some of these questions may more properly be decided by the Court.

Based on the foregoing, the Bank's Motion for Summary Judgment (ECF No. 51) and Plaintiffs' Motion for Summary Judgment on Counterclaims (ECF No. 56) are **DENIED.**

A separate Order will issue.

April 19, 2019

_____/s/_____
PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE